**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:26-mj-00080** |
| | : | |
| **COLE TOMAS ALLEN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion to detain defendant Cole Tomas Allen pending trial. The defendant attempted to kill the President of the United States, Donald J. Trump. The crimes with which the defendant is charged are among the most serious in the United States Code, and the evidence of his guilt is overwhelming. He faces a possible sentence of life in prison (if convicted of 18 U.S.C. § 1751(c)) and a mandatory minimum sentence of ten years consecutive to any other sentence imposed (if convicted of 18 U.S.C. § 924(c)(1)(A)(iii)). The defendant's actions were premeditated, violent, and calculated to cause death. Considering the relevant statutory factors, there is no condition or combination of conditions that will reasonably assure the safety of other people or the community if the defendant were released from custody. The Court should detain the defendant pending trial.

**BACKGROUND**

Shortly after 8:30 p.m. on April 25, 2026, United States Secret Service ("USSS") personnel engaged and stopped the defendant—who was armed with a 12-gauge pump action shotgun, a .38 caliber pistol, multiple knives and daggers, and a significant amount of ammunition for reloading—as he sprinted toward the doors of the Washington Hilton ballroom hosting attendees at the White House Correspondents' Association Dinner, including the President and many of his

top administration officials.    The defendant was arrested on scene, and, on April 27, he was charged with violating 18 U.S.C. § 1751(c) (Attempt to Assassinate the President of the United States); § 924(b) (Transportation of a Firearm & Ammunition in Interstate Commerce with Intent to Commit a Felony); and § 924(c)(1)(A)(iii) (Discharge of a Firearm during a Crime of Violence). *See* ECF No. 1.    The defendant made his initial appearance the same day, and he was held pending a detention hearing scheduled for April 30, 2026.

### *The 2026 White House Correspondents' Association Dinner Attack*

The White House Correspondents' Association Dinner (the "Dinner") is an annual event hosted by the White House Correspondents' Association that dates back more than a century. The Dinner is typically held in late April at the Washington Hilton hotel located at 1919 Connecticut Avenue in Northwest, Washington, D.C.    On many occasions, the President of the United States has attended the Dinner.

The 2026 Dinner took place on April 25 at the Washington Hilton.    President Trump, First Lady Melania Trump, Vice President JD Vance, and approximately one dozen members of the President's Cabinet attended the event.    The Dinner's main program commenced at 8:00 p.m., and shortly thereafter the President and other high-ranking U.S. government officials took their seats on a raised dais inside the ballroom.    The event was broadcast on national television.

Shortly after 8:30 p.m., the defendant approached a USSS security screening checkpoint located on the Terrace Level of the hotel.    Entrances to the ballroom were located on the Concourse Level, a floor below the screening checkpoint, down two open flights of stairs.    Before the defendant approached the checkpoint, he discarded a long black coat that concealed a 12-gauge pump-action shotgun.    The defendant then sprinted through one of the magnetometers at the

checkpoint and ran in the direction of the stairs leading to the ballroom where the President and members of his family and Cabinet were located.   As the defendant did so, he held a shotgun in both hands in a raised position parallel to the ground.   A USSS officer observed the defendant fire the shotgun in the direction of the stairs leading down to the ballroom.   The USSS officer and others at the checkpoint heard the gunshot.   The USSS officer drew his service weapon and fired five times at the defendant.   The defendant fell to the ground, was restrained by law enforcement, and was placed under arrest.   The defendant suffered a minor injury to his knee but was not shot.

At the time of his arrest, the defendant was in possession of a Mossberg 12-gauge pump-action shotgun with one spent cartridge in the barrel and eight unfired cartridges in the magazine tube.   An additional six unfired cartridges were attached with Velcro to the shotgun in a detachable ammunition carrier, and the defendant possessed another ten unfired cartridges in a small leather bag.   The defendant was also in possession of a Rock Island Armory 1911 .38 caliber pistol loaded with ten rounds of ammunition.   He also had two additional handgun magazines, each containing nine rounds of ammunition.   California and federal database records confirm that the defendant legally purchased the two weapons from separate firearms dealers in California, buying the shotgun on or about August 17, 2025, and the pistol on or about October 6, 2023.   At the time of his arrest, the defendant also had on his person two knives, four daggers, multiple sheaths, multiple holsters, needle nose pliers, wire cutters, and a Samsung cellphone.[1]

---

[1] After the attack, law enforcement executed a search warrant on the defendant's hotel room.   Law enforcement recovered, among other evidence, two additional knives, a magazine with ten rounds of ammunition, two boxes each containing ten rounds of shotgun ammunition, a half facepiece respirator, a roll of duct tape, and two rolls of grip tape.   In addition, law enforcement conducted a search of the defendant's parents' residence outside of Los Angeles, California, where the defendant resided.   In a bedroom belonging to the defendant, law enforcement recovered two long gun bags, a Mossberg butt stock, a pistol holster, a training pistol,

The photographs below show some of the weapons and accessories that the defendant possessed

when he was arrested:





and shotgun ammunition, along with several electronic devices.












*The Defendant's Assassination Plans*

At some point before the attack, the defendant wrote emails explaining the actions he was about to take and scheduled those emails to be sent to specific people at approximately 8:30 p.m. on April 25—just minutes before the defendant, laden with weapons, sprinted through the screening checkpoint toward the Dinner.  The email recipients included members of the defendant's family, friends, and a former employer.   The email to family members stated: "I wish I could have said anything earlier, but doing so would have made none of this possible. My sincerest apologies for all the trouble I've caused. (scheduled send)-Cole."   The email to the former employer stated, among other things: "I'll include the full text as an attachment, but I do specifically want to apologize for the unprofessionality [sic] of all this. Consider me to be submitting my resignation effective immediately (if it matters.)"

Attached to the emails was a text file titled "Apology and Explanation," which stated, in part, the following:

Hello everybody!

So I may have given a lot of people a surprise today. Let me start off by apologizing to everyone whose trust I abused.

I apologize to my parents for saying I had an interview without specifying it was for "Most Wanted."

I apologize to my colleagues and students for saying I had a personal emergency (by the time anyone reads this, I probably most certainly DO need to go to the ER, but can hardly call that not a self-inflicted status.)

I apologize to all of the people I traveled next to, all the workers who handled my luggage, and all the other non-targeted people at the hotel who I put in danger simply by being near.

I apologize to everyone who was abused and/or murdered before this, to all those who suffered before I was able to attempt this, to all who may still suffer after,

6

regardless of my success or failure.

I don't expect forgiveness, but if I could have seen any other way to get this close, I would have taken it. Again, my sincere apologies.

On to why I did any of this:

I am a citizen of the United States of America.

What my representatives do reflects on me.

And I am no longer willing to permit a pedophile, rapist, and traitor to coat my hands with his crimes.

(Well, to be completely honest, I was no longer willing a long time ago, but this is the first real opportunity I've had to do something about it.)

While I'm discussing this, I'll also go over my expected rules of engagement (probably in a terrible format, but I'm not military so too bad.)

Administration officials (not including Mr. Patel): they are targets, prioritized from highest-ranking to lowest

Secret Service: they are targets only if necessary, and to be incapacitated non-lethally if possible (aka, I hope they're wearing body armor because center mass with shotguns messes up people who *aren't*

Hotel Security: not targets if at all possible (aka unless they shoot at me)

Capitol Police: same as Hotel Security

National Guard: same as Hotel Security

Hotel Employees: not targets at all

Guests: not targets at all

In order to minimize casualties I will also be using buckshot rather than slugs (less penetration through walls)

I would still go through most everyone here to get to the targets if it were absolutely necessary (on the basis that most people *chose* to attend a speech by a pedophile, rapist, and traitor, and are thus complicit) but I really hope it doesn't come to that. . . .

7

\*    \*    \*

The defendant's "Apology and Explanation" letter also included a list of hypothetical objections to the defendant's plan to kill the President and other senior U.S. government officials, with the defendant's responses to the hypothetical objections.    One of the defendant's hypothetical objections was, "You didn't get them all."    In response, the defendant wrote, "Gotta start somewhere."    Another of his hypothetical objections was "Yield unto Caesar what is Caesar's."    In response, the defendant wrote, "The United States of America are [sic] ruled by the law, not by any one or several people. In so far as representatives and judges do not follow the law, no one is required to yield them anything so unlawfully ordered."

In a postscript in his letter, apparently written from inside the Washington Hilton after his arrival and observations of the security measures related to the upcoming Dinner, the defendant "rant[ed]" and described what he viewed as deficiencies in the security at the hotel.    He wrote that he "walk[ed] in with multiple weapons and not a single person there [at the hotel] considers the possibility that I could be a threat."    The defendant went on to complain that "if I was an Iranian agent, instead of an American citizen, I could have brought a damn Ma Deuce[2] in here and no one would have noticed shit."    The defendant signed his letter "Cole 'coldForce' 'Friendly Federal Assassin' Allen," and at the end of the letter described how he felt "awful" about what he was about to do, but that he "experience[d] rage thinking about everything this administration has done."    His final words were:    "Can't really recommend it! Stay in school, kids."

---

[2]  "Ma Deuce" is a nickname for the M2 .50 caliber Browning Heavy Machine Gun.

*Planning and Preparation*

Although just days old, the investigation of the defendant's assassination attempt has yielded significant evidence of the defendant's extensive planning and preparation for his attack on April 25, 2026.

On March 2, 2026, President Trump publicly announced that he would attend the Dinner, posting on his Truth Social account: "The White House Correspondents Association has asked me, very nicely, to be the Honoree at this year's Dinner, a long and storied tradition since it began in 1924, under then President Calvin Coolidge."   President Trump added that it would be his honor to accept the invitation.   The March 2 post was publicized by various media outlets.

A little over a month later, on April 6, at approximately 2:00 p.m., the defendant used his cellphone to search "white house correspondents dinner 2026" using an online search engine and visited the webpage https://whca/press/news/news/annual-dinner/.   Less than two hours later, at 3:28 p.m., the defendant received a confirmation email for a two-night stay at the Washington Hilton from April 24 to 26, 2026.   Ten days later, on April 16, the defendant used his cellphone to access a series of online media articles discussing the Dinner, including its host, the event schedule, and expected attendees.

At some point before April 21, 2026, the defendant purchased a one-way Amtrak train ticket from Los Angeles, California to Washington, D.C., via Chicago, Illinois.   On April 21, the defendant used a ride share application to travel from his home to Los Angeles Union Station, where he boarded a long-distance Amtrak passenger train to Chicago—a route famous for its scenic views of the mountains and deserts of the American West before traversing the vast expanse of the Great Plains.   While en route, on April 22, the defendant used his cellphone to view a news

9

article titled "Trump's Plans for 'Mic-Drop' Media Confrontation Are Leaked: The president is planning a rage-fueled moment at the White House Correspondents' Association dinner." The defendant arrived in Chicago in the afternoon on April 23. A few hours later, the defendant boarded a second Amtrak train to Washington, D.C., this time passing through the Great Lakes and Appalachia regions of the eastern United States. While en route from Chicago to D.C., the defendant again used his cellphone to visit the website of a D.C. newspaper to view an article titled "Social Scene: Your Guide to the 2026 White House Correspondents Dinner Weekend."

The defendant also kept a running note on his phone of his observations and thoughts during his cross-country train journey. He wrote that "[t]he southwest desert in spring Distant wind turbines looming like snowy mountains across the hazy NM desert," that "Chicago is cool; kinda like an Iowa small town was scaled up to LA size," and that Pennsylvania's "woods are awesome (look like vast fairy lands filled with tiny trickling creeks in spring apparently." The defendant arrived in Washington, D.C., at approximately 1:10 p.m. on Friday, April 24. Approximately 30 minutes later, the defendant purchased a Metro Smartcard with a 3-day bus rail pass. He then traveled by Metro train from Union Station to Dupont Circle and checked into the Washington Hilton at approximately 3:15 p.m.

The next day, April 25, was the night of the Dinner. On that day, the defendant left his room at the Washington Hilton multiple times. During one occasion on April 25, at approximately 6:26 p.m., the defendant left his hotel room for approximately twenty minutes. During that time, he used his cellphone to visit the webpage "Presidential Schedule – CivicTracker" on civictracker.us/executive/schedule/.

At approximately 8:03 p.m., while back inside his hotel room, the defendant used his cellphone to take a photograph of himself in the mirror.   In the photograph (below left), the defendant was wearing a black dress shirt, black slacks, and what appears to be a red necktie, tucked into his pants.   An enhanced version of the image (below right) shows that the defendant also appeared to be wearing a small leather bag consistent in appearance with the ammunition-filled bag later recovered from his person (item 1), a shoulder holster (item 2), a sheathed knife consistent in appearance with one of the knives later recovered from his person (item 3), and pliers and wire cutters consistent in appearance with those later recovered from his person (item 4).

 

About ten minutes later, at approximately 8:13 p.m., the defendant again visited the "Presidential Schedule – CivicTracker" webpage again.   Approximately two minutes later, he exited his hotel room.   At about 8:27 p.m., just minutes before the attack, the defendant used his cellphone to visit a media company's website and accessed the video, "WATCH LIVE: President

Trump, first lady en route to White House Correspondents' Dinner." He also visited another website to view live media coverage of the President exiting his vehicle to attend the Dinner. Less than one minute later, the defendant searched "trump white house correspondents dinner" on a web search engine. The defendant's prescheduled emails with the "Apology and Explanation" attachment were sent a few minutes later, at approximately 8:30 p.m. Shortly thereafter, the defendant rushed the screening checkpoint on the Terrace Level of the Washington Hilton with a raised shotgun.

## STATUTORY BASIS FOR DETENTION

The government seeks pretrial detention under 18 U.S.C. §§ 3142(f)(1)(A), (B), and (E). The defendant is charged with attempted assassination of the President in violation of 18 U.S.C. § 1751(c), which is a crime of violence and an enumerated federal crime of terrorism under 18 U.S.C. § 2332b(g)(5)(B) that carries a maximum sentence of life imprisonment. *See* 18 U.S.C. §§ 3142(f)(1)(A), (B). He is also charged with discharging a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii), which is itself a crime of violence under the Bail Reform Act. *See* 18 U.S.C. § 3142(f)(1)(A); *United States v. Anderson*, 177 F. Supp. 3d 458, 462–63 (D.D.C. 2016). And he is charged with transporting firearms across state lines intending to commit a felony in violation of 18 U.S.C. § 924(b), a firearm offense punishable by up to ten years in prison. *See* 18 U.S.C. § 3142(f)(1)(E).

Upon a finding of probable cause that the defendant violated § 1751(c) or 924(c), the federal bail statute creates a rebuttable presumption that no conditions will reasonably assure the community's safety if the defendant is released pending trial. 18 U.S.C. §§ 3142(e)(3)(B), (C).

12

## ARGUMENT

Had the defendant achieved his intended outcome, he would have brought about one of the darkest days in American history.    The defendant traveled across the country with the explicit aim to kill the President of the United States.    The defendant, armed with a 12-gauge shotgun, a .38 caliber pistol, two knives, four daggers, and enough ammunition to take dozens of lives, was apprehended by USSS officers mere feet away from the ballroom where his primary target was located, along with other members of the Cabinet.    This was a planned attack of unfathomable malice that risked the lives of hundreds of people whose only transgression was attending an annual event celebrating the media and featuring the President of the United States.    It was, at its core, an anti-democratic act of political violence.

The proffered evidence of the charged offenses far exceeds probable cause, and the federal bail statute creates a rebuttable presumption that the defendant would pose an intolerable risk of danger to the community if released pending trial.    Together with the statutory presumption of detention,[3]  the Court must consider: (1) the nature and circumstances of the offenses charged; (2)

---

[3]  Where the presumption is implicated, it imposes a "burden of production on the defendant to offer some credible evidence contrary to the statutory presumption."    *United States v. Boykins*, 316 F. Supp. 3d 434, 436 (D.D.C. 2018).    Even if rebutted, however, "the presumption does not disappear entirely but remains a factor to be considered among those weighed by the district court."    *United States v. Thomas*, 456 F. Supp. 3d 69, 71 (D.D.C. 2020); *United States v. Gamble*, 810 F. App'x 7, 8 (D.C. Cir. 2020) ("[T]he statutory presumption does not disappear like a 'bursting bubble' once a defendant offers some evidence that he is not a danger to the community[.]").    The presumption is still "given substantial weight," *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011), as it is "not simply an evidentiary tool designed for the courts," but also serves as a reflection of "Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial[.]"    *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (quoting *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010)).

the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.    *See* 18 U.S.C. § 3142(g).    In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."    *Id.* § 3142(f).

The facts and circumstances in this case compel the conclusion that there is no condition or combination of conditions that would reasonably assure the community's safety if the defendant were released pending trial.    Detention is warranted based on the gravely serious and highly calculated nature of the defendant's crimes, the overwhelming evidence of his guilt, and the intolerable risk that he will again resort to extreme violence to register political disagreement.

### Nature and Circumstances of the Charged Offenses

The defendant is charged with traversing the country armed to the teeth, rushing through USSS security with a 12-gauge shotgun, and attempting to assassinate the President of the United States.[4]    Yet those crimes, as heinous and infamous as they are, do not fully capture the defendant's plan.    The defendant was willing to commit a mass shooting inside a room full of the highest-ranking officials in the U.S. government.    Worse still, although the defendant articulated his own disconcerting "rules of engagement," he expressly noted that every attendee of the Dinner was acceptable collateral damage merely because they chose to attend an event at which the

---

[4] The D.C. Circuit has previously upheld an attempted assassination prosecution under 18 U.S.C. § 1751(c) on comparable facts.    *See generally United States v. Duran*, 96 F.3d 1495 (D.C. Cir. 1996) (upholding application of § 1751(c) where defendant took "substantial steps" in pursuing objective to kill the President by purchasing weapons, traveling across country, and waiting outside White House, despite fact that defendant's gunshots were not directed at the President but were directed at someone who resembled the President and the USSS personnel who attempted to subdue him).

14

President would speak.   The defendant did all of this for the purpose of engaging in an act of political violence, which the D.C. Circuit has recognized places him "in a different category of dangerousness."   *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021); *see id.* at 1285 n.1 (Katsas, J., concurring in part and dissenting in part).   The nature and circumstances of the defendant's crimes weigh dramatically in favor of pretrial detention.

The defendant's choice of targets demonstrates the deeply dangerous nature of his conduct. Attempted murder is always a serious crime, but when the intended victim is the President of the United States, as well as other high-ranking members of the U.S. government, the potential consequences are far reaching.   Had the defendant successfully made it into the ballroom, he not only could have killed or injured dozens of people, but he could have destabilized the entire federal government, given the number of high-ranking government officials present.   The defendant sought to express his political opinions through violence.   The Court should consider the identities of the defendant's intended victims and the significant roles they play in governing this country to assess the nature of the charged offenses.

The defendant's crimes were also premeditated and calculated to achieve his objectives. The defendant's actions leading up to and on the night of April 25, 2026 were the product of at least weeks of premeditation and planning.   From his home outside of Los Angeles, California, the defendant selected the Dinner at the Washington Hilton as the event where he would try to kill the President, and he booked a room at the Washington Hilton a few weeks before the event.   He then spent multiple days carrying and transporting a veritable armament across the country from California to Washington, D.C., by train.   The defendant's internet history in the hours and minutes before his attack on April 25, 2026 is particularly illustrative of the premeditated nature

15

of his crimes.    The defendant used open-source media to track the President's movements leading up to the Dinner and then timed his attack for after the President and the First Lady had arrived at the Washington Hilton.    The defendant was stopped only because of the brave actions of law enforcement.    The calculated nature of the defendant's criminal conduct over an extended period of time should carry significant weight in the Court's detention determination.

The defendant also was willing to harm others who got in the way of his intended political targets.    In his letter to family and friends, he explained that while he had so-called "rules of engagement" and a list of prioritized targets, he "would still go through most everyone here to get to the targets if it were absolutely necessary."    In his own words, he viewed anyone attending the Dinner as a legitimate target because they "chose" to attend the President's speech.    The defendant's callous disregard for human life and his willingness to harm others who, even though not his political targets, impeded his efforts to kill the President further demonstrate the heinous nature of his crime and his willingness to use violence.

At root, the defendant's crimes were acts of extreme political violence.    While the investigation is still in its nascent stage, the evidence collected thus far shows that the defendant sought to kill the President because he disagreed with him politically and wanted to "fight back" against government policies and decisions that he found morally objectionable.    The political nature of the defendant's crimes further counsels in favor of detention because the defendant's motivation for committing the crimes exists so long as he disagrees with the policies or decisions of the President or his government.    So long as the President and members of his Cabinet continue to appear publicly, which they undoubtedly will, the defendant's motivation for violence remains. *See Munchel*, 991 F.3d at 1284 (court should consider likelihood that "specific circumstances"

16

giving rise to offense conduct will reoccur).    Moreover, in the defendant's own words, he believes that "representatives and judges do not follow the law," and thus he does not believe he is bound to follow the law because he views the decisions of those representatives and judges as unlawful. This type of justification for political violence is especially dangerous because it is without bounds. If, in the defendant's view, he is the ultimate arbiter of political and legal authority, then he is not bound to follow any law, including the criminal laws of the United States or any dictates of this Court, if he deems them unlawful.    Such logic can be employed easily to justify disregarding judicial orders, including any conditions of release.    The Court should have little confidence on this record that "the defendant will actually abide by its conditions."    *Id.* at 1280–81.

Ultimately, the defendant failed to accomplish his objectives because law enforcement stopped him.    It is extraordinary good fortune that no one, including the defendant, was seriously hurt or killed as a result of the defendant's actions.    But that good fortune does not diminish the seriousness of his crimes and the need to keep him detained.    *See United States v. Klein*, 539 F. Supp. 3d 145, 153 (D.D.C. 2021) (rejecting claim that defendant's actions did not precipitate "specific acts of violence or the death or injury of any person" as "more a product of fortune than fate").    Indeed, the defendant, if convicted, faces life imprisonment and a mandatory minimum sentence of ten years consecutive to any other sentence.    These are "substantial terms of imprisonment [that] reflect Congress' appreciation for the severity of these offenses."    *United States v. Brown*, 538 F. Supp. 3d 154, 167 (D.D.C. 2021); *see also United States v. Wills*, 311 F. Supp. 3d 144, 148 (D.D.C. 2018) (five-year mandatory minimum "reflect[ed] Congress' judgment as to the seriousness of the offense").    The defendant's actions, and the significant potential sentence he now faces, reflect the need for pretrial detention in this case.

### *Weight of the Evidence Against the Defendant*

As described above, even at this early stage in the investigation, the overwhelming weight of the evidence in this case, and the attendant likelihood of the defendant's conviction for serious and dangerous offenses carrying significant and lengthy terms of incarceration, favors pretrial detention. *See, e.g.*, *United States v. Taylor*, 289 F. Supp. 3d 55, 65–66 (D.D.C. 2018) ("If the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the government's burden of persuasion.").

### *The Defendant's History and Characteristics*

Although the defendant apparently has not had prior contact with the criminal justice system, his personal history and circumstances demonstrate that conditions less restrictive than detention will not reasonably assure the community's safety while this case proceeds. The defendant is highly educated and, until shortly before the events of April 25, 2026, he was employed and living with his family in California. Despite this stability, the defendant chose to embark on a journey that culminated in this violent attack. The defendant also was able to deceive his family and travel to Washington, D.C., with his weapons by train without detection. Thus, the defendant has demonstrated not only a capacity to accumulate and use significant amounts of lethal weaponry, but also a willingness to deceive those closest to him to achieve his political objectives through violence. As the D.C. Circuit recognized in *Munchel*, when a court assesses the prospective threat posed by a defendant, it should consider both "the nature of the threat" and "the resources and capabilities of the defendant"—*i.e.*, whether the defendant has the "means of continuing to" engage in the same conduct "in the future." 991 F.3d at 1283. As the

18

evidence proffered above demonstrates, the defendant has such capabilities and means, and this factor favors detention.

### *Danger to the Community*

The defendant traveled across the country with dangerous weapons for the purpose of attacking a meeting of the nation's most senior political leaders, including the President of the United States.   He intended to kill and fired his shotgun while trying to breach security and attack his target.   Put simply, the defendant poses an uncommonly serious danger to the community if released pending trial.   The defendant's lack of criminal history and other personal circumstances do not alter this conclusion.   *See generally* Mem. Op. and Order, ECF 28, *United States v. Brian Cole, Jr.*, 26-cr-1 (D.D.C. Jan. 2, 2026) (ordering detention of defendant with no prior criminal contacts, steady employment, strong community ties, and family support where defendant committed act of political violence by planting pipe bombs outside political party headquarters, even after assuming presumption rebutted).   The community should not be subjected to the prospective, "articulable threat" that the defendant will reject this Court's legitimacy just as he rejected the legitimacy of the U.S. government, or that he will again resort to violence as his chosen means to register his political disagreement.   *See Munchel*, 991 F.3d at 1283–84.   There is no combination of conditions that will reasonably assure the community's safety if the defendant is released, and he should be detained pending trial in this case.

**CONCLUSION**

For the reasons stated above, the government respectfully requests that the Court grant its

motion and detain the defendant pending trial.

Respectfully Submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Charles R. Jones*
CHARLES R. JONES (D.C. Bar No. 1035541)
JOCELYN BALLANTINE (CA Bar No. 208267)
ADAM P. BARRY (CA Bar No. 294449)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530
Tel: (202) 252-6976
Charles.Jones3@usdoj.gov
Tel: (202) 252-7252
Jocelyn.Ballantine2@usdoj.gov
Tel: (202) 252-7793
Adam.Barry@usdoj.gov